**NATURAL RESOURCES CORPORATION,** Plaintiff,

v.

**ROYAL RESOURCES CORPORATION,** **Defendant.**

**No. 75 Civ. 5900.**

United States District Court, S. D. New York.

Feb. 28, 1977.

Dornbush, Mensch & Mandelstam, New York City, for plaintiff; Martin Mensch, Carol Berg Geist, New York City, of counsel.

Lefrak, Fischer & Myerson, New York City, for defendant; Gerald D. Fischer, Carol R. Aronoff, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

 Defendant Royal Resources Corporation ("Royal") moves for judgment on the pleadings pursuant to Rule 12(c), Fed.R. Civ.P., or, in the alternative, for summary judgment under Rule 56, Fed.R.Civ.P., on the grounds that this action is barred by the applicable statute of limitations. Because affidavits and exhibits have been furnished to the Court, the motion will be treated as one for summary judgment. For the reasons hereinafter stated, defendant's motion is granted.

Natural Resources Corporation ("NRC") brings this action against Royal to recover damages resulting from the latter's alleged fraud in connection with the sale to NRC of rights and interests in certain Wyoming uranium properties ("Green Mountain Properties"). Plaintiff alleges that defendant failed to disclose an agreement which it had with a third party which restricted defendant's ability to sell the rights and interests

it purported to sell to NRC. These rights and interests constitute securities and this suit is brought under § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder (17 C.F.R. 240.10b–5).

In its complaint NRC claims that it was defrauded into paying $497,187.50 on or about August 26, 1969 and $248,802.00 on or about May 27, 1970. However, plaintiff contends that the fraud was not discovered until between March and December 1972, a matter which will be addressed later in this opinion. This action was commenced on November 21, 1975.

NRC's complaint describes it as a Maryland corporation with its principal place of business in Denver, Colorado. Royal is a Delaware corporation with its principal place of business also in Denver, Colorado. Royal was and is a wholly owned subsidiary of The Colorado Corporation ("TCC"). TCC was adjudicated bankrupt in the United States District Court for the District of Colorado on September 6, 1974. The complaint indicates that NRC has filed a reclamation petition in the TCC bankruptcy proceeding.

■ The federal securities laws under which this action is brought do not provide for a statute of limitations. Accordingly, the federal court must apply the statute of limitations of the forum state, including any applicable "borrowing statute." *Sack v. Low*, 478 F.2d 360, 365 (2d Cir. 1973) ("*Sack v. Low*"). See *Mittendorf v. J. R. Williston & Beane Inc.*, 372 F.Supp. 821, 830 (S.D.N.Y.1974).

The relevant law of the forum state is the New York statute of limitations for fraud, which is six years from the time of the fraud itself or two years from the time plaintiff discovered or could, with reasonable diligence, have discovered the fraud, whichever is later. N.Y. CPLR §§ 203(f), 213(8) (McKinney Supp. 1976). See *Mittendorf v. J. R. Williston & Beane Inc., supra* at 830.

The New York borrowing statute, CPLR § 202 (McKinney 1972), as applicable to non-resident parties, reads as follows:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued.

The parties agree that the cause of action accrued "without the state." They differ, however, as to *where* it accrued. In *Sack v. Low, supra* at 365, the Second Circuit stated:

The traditional view has been that a cause of action for tort arises when and where "the last event necessary to make an actor liable . . . takes place." Restatement of the Conflict of Laws § 377 (1934). [("First Restatement")] Since a tort action traditionally has not been viewed as complete until the plaintiff suffers injury or loss, the cause of action has been considered to arise at the place where this damage was sustained. As applied to a cause of action for fraud or deceit, the closest common law analogy to an action under Rule 10b–5, see *Klein v. Auchincloss, Parker & Redpath*, 436 F.2d 339, 341 (2 Cir. 1971); 3 Loss, Securities Regulation 1774 (2d ed. 1961); 6 *id.* 3901–02 (1969); and cases there cited, this reasoning leads in the direction of the rule of the First Restatement of Conflicts, § 377, note 4, that "when a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."

Continuing, the Court said that "loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence." *Id.* at 366 (citations omitted). Such a claim has been said to arise where "plaintiffs' pocketbooks are situated." *Arneil v. Ramsey*, 414 F.Supp. 334, 338 (S.D.N.Y.1976), *aff'd*, 550 F.2d 774 (2d Cir. 1977) ("*Arneil v. Ramsey*").

The parties differ as to the location of plaintiff's pocketbook. In bringing on this motion, Royal contends that since NRC's principal place of business is Colorado, its

cause of action accrued in that state. Therefore, Colorado's three year statute of limitations for fraud rather than the longer New York statute applies, and this action is time-barred.

NRC replies that its economic loss was incurred in 1969 and 1970 when it made the payments sued upon here. At that time, it asserts, its principal place of business was Ferney-Voltaire, France. Appended to NRC's papers in opposition to this motion is an opinion letter signed by Olivier Roux, Avocat a la Cour, expressing the view that a French ten year statute of limitations applies. A copy of the purportedly relevant provision was submitted accompanied by an English translation certified to be a "true and faithful translation" by a sworn translator to the Court of Appeal of Paris. Under the New York borrowing statute, the shorter of the two time limits, French or New York, applies. Therefore, NRC contends, the New York six year statute of limitations governs and the action is timely.

Royal responds by reiterating its original argument and also by propounding an alternative theory. Royal claims that in the period 1968–70 NRC's place of business was Geneva, Switzerland and therefore the Swiss statute of limitations would apply. Defendant asserts and offers to prove at a future hearing that the relevant Swiss statute of limitations is one year. Since it is shorter than New York's fraud statute of limitations, under the New York borrowing statute, the Swiss one year statute of limitations would apply and would render NRC's claim time-barred.

If the First Restatement approach must be applied to this statute of limitations problem, then this dispute as to NRC's location is of great significance. However, a thoughtful discussion in *Sack v. Low*, must not be overlooked.

The Second Circuit Court of Appeals noted that the First Restatement approach to conflict of laws had fallen into disfavor and that New York courts, in accord with the principles of *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) and the Restatement (Second) of the Con-

flict of Laws (1971) ("Second Restatement"), had largely abandoned it. The borrowing statute, however, the Court saw as an exception.

The few borrowing statute cases since *Babcock* afford no inkling that the New York courts are applying its sophisticated teachings, rather than the rigid approach of the First Restatement of Conflicts, to the problem of where a cause of action arose under the borrowing statute. Quite to the contrary, they take a rather simplistic approach, adhering to the mechanical question where the cause of action arose or, in the words of the borrowing statute, whether the "cause of action accru[ed] without the state . . . ." *Cellura v. Cellura,* 24 A.D.2d 59, 263 N.Y. S.2d 843 (4th Dep't 1965); *Myers v. Dunlop Tire & Rubber Corp.,* supra, 40 A.D.2d 599, 335 N.Y.S.2d 961; *Daigle v. Leavitt,* 54 Misc.2d 651, 283 N.Y.S.2d 328 (Sup.Ct. 1967). A recent note, Choice of Law and the New York Borrowing Statute: A Conflict of Rationales, 35 Albany L.Rev. 754, 762 (1971), concludes, although with some regret:

> The impact of the conflict of laws decisions discussed above [i. e., *Babcock v. Jackson, et al.*] on the New York State "borrowing statute" has been nonexistent. Except for a few commentaries to the effect that these decisions should affect the borrowing statute, there has been no actual impact on the statute by these decisions.

*Sack v. Low, supra* at 367.

This is no longer true. Modern conflict of laws thinking has finally had some impact on the borrowing statute, in a case entitled *Martin v. Julius Dierck Equipment Co.,* 52 A.D.2d 463, 384 N.Y.S.2d 479 (2d Dep't 1976) ("*Martin*"). Dean McLaughlin has stated:

> [T]he *Martin* decision is the first borrowing statute case to recognize that determining where a cause of action arises is just as capable of subtle conflict of laws analysis as the most discriminating choice of law decisions. Thus, New York, as the forum, must decide where the cause of

action arose; and the *Martin* case indicates that the question is an much subject to a choice of law as any other question of law. Accordingly, that question should be decided under the "grouping of contacts" or "center of gravity" conflict of laws doctrine that now prevails generally.

J. McLaughlin, *Supp.Prac.Comm.* to N.Y. CPLR § 202 (McKinney Supp. 1976).

Martin, a resident of the District of Columbia, was injured while operating a fork lift truck on his job in Virginia. He sued both the New York manufacturer and distributor of the vehicle on causes of action for negligence and breach of warranty. The court below determined that the warranty claim accrued in New York where the truck had been sold, while the negligence cause of action accrued in Virginia where the injury occurred.

The Second Department disapproved of this approach. The Court opted for "modern conflict of laws doctrine," stating that

> [T]he test requires us to determine what the essence of the action is and which jurisdiction has the most significant contacts with the issues before the court (cf. *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279; *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99).

52 A.D.2d at 466, 384 N.Y.S.2d at 482. The Court concluded:

> Accordingly, we hold that under the "grouping of contacts", or "center of gravity" conflict of laws doctrine, the causes of action in this matter accrued in Virginia; and, under New York's "borrowing" Statute of Limitations (CPLR 202), Virginia's two-year Statute of Limitations is applicable. In arriving at this conclusion, we also take cognizance of the fact that we are giving effect to the primary purposes of the "borrowing" statute, which are to prevent "forum shopping" by nonresident plaintiffs (*Daigle v. Leavitt*, 54 Misc.2d 651, 283 N.Y. S.2d 328; 1 Weinstein-Korn-Miller, N.Y. Civ.Prac., par. 202.01), and also to give resident defendants the benefit of the shortest period of limitations (*Fullmer v.*

*Sloan's Sporting Goods Co.*, 277 F.Supp. 995, D.C.N.Y.).

*Id.* at 468, 384 N.Y.S.2d at 483.

The instant case is a prime candidate for the application of modern conflicts doctrine. Use of a mechanical *lex loci* concept, looking to the plaintiff's location at the time of the loss, seems to result in a choice of either French or Swiss law, depending upon whose version of the facts is to be believed.

■ On the other hand, examination of this case in light of modern conflicts doctrine would take into account a number of factors. On the issue of fraud, the Second Restatement approach is as follows:

§ 148. Fraud and Misrepresentation

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Among other relevant considerations are the general principles of the Second Restatement, listed at § 6:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

NRC, which was invoiced in Europe, acted in reliance upon Royal's alleged misrepresentation by remitting payments from its foreign headquarters, the first of which was drawn on a New York bank. Wyoming land was the subject of the parties' transaction. The initial understanding out of which the transaction originated was reached at a meeting in Acapulco, Mexico.

Although plaintiff at the time of the loss was in Europe and only later moved to Colorado, a subsequent change of residence has been taken into account in conflict analysis by the New York Court of Appeals. *Miller v. Miller,* 22 N.Y.2d 12, 290 N.Y.S.2d 734, 237 N.E.2d 877 (1968). Defendant's actions, here under attack, originated from its offices in Colorado. Both parties have maintained a principal place of business in Colorado since 1971. Defendant's parent corporation is the subject of a bankruptcy proceeding in the federal district court in that state. Presumably the economic impact of either victory or defeat in this lawsuit will be felt in Colorado. Therefore, the state with the most significant contacts and most substantial interest in this litigation is Colorado.

During the pendency of this motion, the Second Circuit handed down its decision in *Arneil v. Ramsey,* reiterating the holding of *Sack v. Low.*

The Court did not discuss *Martin,* citing instead a 1975 decision of this Court for the proposition that no change had occurred in New York law. New York's interest in the operation of its borrowing statute to protect resident defendants was noted. A portion of Judge Breitel's concurrence in *Neumeier v. Keuhner,* 31 N.Y.2d 121, 131, 335 N.Y.S.2d 64, 72, 286 N.E.2d 454, 459 (1972), was quoted:

> What the *Babcock* case * * * taught and what modern day commentators largely agree is that *lex loci delictus* is unsoundly applied if it is done indiscriminately and without exception. It is still true, however, that *lex loci delictus* is the normal rule * * *.

*Arneil v. Ramsey, supra* at 780. The Court of Appeals went on to detail the ties plaintiffs in *Arneil v. Ramsey,* Washington residents, had to that state which compelled application of the Washington statute of limitations.

If *lex loci delictus* is the normal rule on borrowing statute questions, the instant case is the exception to that rule. Here, in contrast to *Arneil v. Ramsey,* there is no resident party to be protected. Here, as in that case, forum shopping can be discouraged, but by a different route.

The result in *Arneil v. Ramsey* would probably be the same whether First Restatement or Second Restatement analysis were used. Clearly, the state with the most significant contacts and most substantial interest in that dispute was Washington, which was also the plaintiffs' residence at the time of the loss. The instant case presents an altogether different problem and, in this Court's view, warrants a different approach, that of the Second Restatement. Accordingly, the Colorado statute of limitations will be applied.

The applicable Colorado statute of limitations is three years.

> Bills for relief on the ground of fraud shall be filed within three years after the discovery by the aggrieved party of the facts constituting such fraud, and not afterwards.

Colo.Rev.Stat. § 13–80–109 (1973). *See deHaas v. Empire Petroleum Company,* 435 F.2d 1223, 1225 (10th Cir. 1970); *Trussell v. United Underwriters, Ltd.,* 228 F.Supp. 757, 775–76 (D.Colo.1964). Thus, if NRC became aware of the facts constituting the alleged

fraud more than three years prior to the commencement of this action on November 21, 1975, this suit is time-barred. The question is, when did NRC become aware of the fraud?

■ The president of NRC, Jacques W. Zoller, ("Zoller"), testified in his deposition that NRC first became aware in December, 1971 that the firm had been "bilked." In March of 1972, NRC learned that Royal could not freely assign interests in the Wyoming properties without the approval of a third party and that such approval had never been given. In April, 1972 NRC, or possibly its counsel, received a copy of an agreement between Royal and that third party, Kerr-McGee Corporation ("Kerr-McGee"), regarding the Green Mountain Properties.

In Zoller's deposition he concedes that Exhibits A, F, and G to the complaint were received by NRC or NRC's counsel "[p]robably within a few days" of April 13, 1972. Exhibit A is "[a] copy of the Farmout Agreement . . . together with a description of the Green Mountain Properties which were the subject of such agreement. . . ." The complaint describes that agreement as follows:

> By letter dated June 18, 1969, Royal and Kerr-McGee entered into a farmout agreement (the "Farmout Agreement") relating to the Green Mountain Properties pursuant to the terms and conditions of which Royal was granted the opportunity to earn an undivided one-half interest in the Green Mountain Properties by expending $375,000 in exploratory drilling on the properties prior to September 1, 1971, to satisfy the assessment work requirements on the mining claims included in the Green Mountain Properties.[1]

In response to an interrogatory propounded by Royal in order to learn when, how, and from what source NRC first became aware of Royal's alleged fraudulent conduct, NRC identified a rather broad time span, March 20, 1972 to December 31, 1972. Plaintiff adverted to a March 20, 1972 letter and a conversation at some point after April 13, 1972 as sources of information.[2]

1. NRC's complaint further identifies Exhibits F and G:

(g) On or about December 15, 1969, Royal assigned all of its rights under the letter agreement dated June 18, 1969 to TCC with Kerr-McGee's consent granted by a letter agreement dated December 8, 1969, a copy of which is attached hereto as Exhibit F. Kerr-McGee's consent was subject to the stated condition, among others, that TCC "not assign, in whole or in part, any of the rights under the Letter Agreement so assigned to it by Royal without the specific consent of Kerr-McGee thereto having first been obtained in writing".

(h) By letter dated February 6, 1970, Kerr-McGee acknowledged to TCC that TCC had complied with the Farmout Agreement insofar as the required expenditure of $375,000.00 was concerned and further acknowledged that such compliance entitled TCC to an undivided one-half interest in the Green Mountain Properties. (A copy of such letter is annexed hereto as Exhibit G).

2. The complete interrogatory and plaintiff's answer thereto read as follows:

5(e) state when, how and from what source plaintiff first learned that defendant had committed acts "which operated as a fraud and deceit upon NRC";

5(e) To the best of the knowledge, information and belief of the current officers and directors of NRC, NRC first learned of the failure of TCC and Royal to disclose to NRC:

(i) that neither they nor either of them had title to the Green Mountain Properties;

(ii) that the interest therein had not been earned by either Royal or TCC at the time of the sale by Royal to NRC;

(iii) that extensive exploration and development work had to be performed and completed before the interests in the Green Mountain Properties could be earned by TCC and Royal; and

(iv) that the interests to be earned by Royal and TCC were subject to the terms, provisions, and conditions of the Farm-out Agreement, certain of which operate to the advantage of Kerr-McGee but to the disadvantage of NRC and would depress the value of the rights and interests sold to NRC below what such rights would be worth absent such provisions, sometime during the period between March 20, 1972 and December 31, 1972, in the course of inquiries conducted by management of NRC and its attorneys following receipt of a letter dated March 20, 1972, on the letterhead of Kerr-McGee Corporation, signed by Dale B. Trubey, Mineral Land Manager, and addressed to Paul W. Fairchild, Natural Resources Corporation.

Copies of the March, 1972 correspondence alluded to in plaintiff's answer to the defendant's interrogatory appear as exhibits to Zoller's deposition. Exhibit 2 is a letter dated March 10, 1972 written to a Mr. D. B. Trubey ("Trubey") of Kerr-McGee and signed by Paul W. Fairchild ("Fairchild"), Vice President—Exploration of NRC. This letter mentions a December 16, 1971 conversation between the two in which Fairchild apparently notified Trubey of NRC's claimed interest in the Green Mountain Properties. That conversation is memorialized in a memorandum to file from Fairchild dated December 22, 1971 which is Exhibit 1 to Zoller's deposition. The memo reports, "Mr. Trubey was not aware of our ownership. . . ."

The March 10 letter offered a check to cover NRC's share of certain costs regarding the Wyoming land. Exhibit 3 is a March 20, 1972 letter in response, sent by Trubey to Fairchild for NRC. It reads:

> We cannot accept the information submitted to us in your letter of March 10, 1972 as establishing title in Natural Resources Corporation to any interest in the Green Mountain Properties. For this reason we cannot accept your check in the amount of $15,600 and it is being returned herewith along with the information contained in your letter.
>
> As a matter of information, under our farmout agreement, the Colorado Corporation is restricted from transferring title in the Green Mountain properties without our prior consent. This consent has not been requested nor granted with regard to the interest asserted in your letter.

This was reiterated in a letter dated September 12, 1972, Exhibit 5 to Zoller's deposition, sent to Fairchild by Kerr-McGee's counsel. Exhibit 12 to the deposition is a letter from one of the attorneys for NRC indicating that these copies were furnished at Royal's counsel's request after he had examined documents specified as sources for plaintiff's answers to defendant's first set of interrogatories.

The Tenth Circuit Court of Appeals has observed that the Colorado fraud statute of limitations begins to run

> "when the defrauded person has knowledge of the facts which in the exercise of proper prudence and diligence would enable him to discover the fraud perpetrated against him." *Greco v. Pullara,* 166 Colo. 465, 444 P.2d 383, 384 (1968); *Hall v. Swan,* 117 Colo. 349, 188 P.2d 437 (1947).

*Herald Company v. Seawell,* 472 F.2d 1081, 1098 n. 24 (10th Cir. 1972). It is evident from plaintiff's own admissions that such knowledge came into its possession more than three years prior to November 21, 1975.

Plaintiff seeks to invoke the federal tolling doctrine of *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946) and *Moviecolor Limited v. Eastman Kodak Company,* 288 F.2d 80, 85 (2d Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). But the essence of that doctrine, that the statute of limitations will begin to run only from the time of discovery of the fraud or the time the fraud should, upon reasonable inquiry, have been uncovered, is embodied in the Colorado statute. *See generally Mittendorf v. J. R. Williston & Beane Inc., supra* at 833; *Korn v. Merrill,* 403

(v) NRC first learned of the failure of TCC and Royal to disclose to NRC that Kerr-McGee's consent was required to assign any interests in or rights under the Farm-out Agreement and that such consent had not been given for the sale of the rights and interests in the Green Mountain Properties to NRC, upon receipt of a letter on the letterhead of Kerr-McGee Corporation addressed to Paul W. Fairchild, Natural Resources Corporation and dated March 20, 1972.

(vi) NRC first learned of the possibility that NRC had contributed all of the funds necessary to earn all of the interest to be earned by Royal and TCC in the Green Mountain properties, of the possibility that neither TCC nor Royal made any payments to earn all of the interest to be earned by Royal and TCC in the Green Mountain properties, and of the fact that neither TCC nor Royal disclosed the foregoing to NRC, sometime subsequent to April 13, 1972, during a conversation between Mr. Fairchild and Fred Groth.

F.Supp. 377, 387 (S.D.N.Y.1975), *aff'd without opinion,* 538 F.2d 310 (2d Cir. 1976).

As the Tenth Circuit has explained:

Although the limitation period is supplied by the state of Colorado, "it is a matter of federal law as to the circumstances that will toll a state statute applied to private actions under the securities laws." *Esplin v. Hirschi,* 10 Cir., 402 F.2d 94, 103. The federal doctrine of tolling as applied to fraud actions was enunciated by the Supreme Court in the early case of *Bailey v. Glover,* 88 U.S. 342, (21 Wall.) 22 L.Ed. 636, 638: "[W]here the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." This equitable doctrine has been consistently applied in private fraud actions under section 10(b) of the Securities Exchange Act. *See Esplin v. Hirschi, supra,* 402 F.2d at 103; *Hooper v. Mountain States Securities Corp.,* [282 F.2d 195, 206 (5th Cir. 1960)].

*deHaas v. Empire Petroleum Company, supra* at 1226.

In a footnote, the Court acknowledged that under both federal and Colorado law the statute of limitations was tolled until plaintiff knew of or could with reasonable diligence have discovered the fraud. *Id.* at 1226, n. 3. The Tenth Circuit quoted with approval the following passage from *Tobacco & Allied Stocks, Inc. v. Transamerica Corp.,* 143 F.Supp. 323, 331 (D.Del.1956), *aff'd,* 244 F.2d 902 (3d Cir. 1957):

It is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts

in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. Thus, the duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings.

*deHaas v. Empire Petroleum Company, supra* at 1226.

Further insight is provided by the Second Circuit:

While state law fixes the length of the limitations period, federal law determines when the period begins to run. *Moviecolor Limited v. Eastman Kodak Company [supra];* cf. *Cope v. Anderson, supra,* 331 U.S. [461] at 464 [67 S.Ct. 1340, 91 L.Ed. 1602]. We have said that

the time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme. "[T]he statutory period . . . [does] not await appellant's leisurely discovery of the full details of the alleged scheme." *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir. 1970). *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir. 1975).

*Arneil v. Ramsey, supra* at 780.

Every detail of the alleged fraud may not have been known to plaintiff by the spring of 1972 but certainly the information possessed over three years before this action was commenced was sufficient to start the statute of limitations running.

In dealing with a borrowing statute problem such as this one it is well to remember that "New York's borrowing statute was specifically designed to prevent

non-residents from shopping for the forum with the most favorable Statute of Limitations . . .." *Jones v. Greyhound Bus Lines,* 73 Misc.2d 109, 111, 341 N.Y.S.2d 159, 161 (Sup.Ct.Or.Co.1973) (citation omitted).

The Court in *Sack v. Low* observed that

There is much to be said for thus recognizing that a cause of action can arise in more than one place and, under an appropriate borrowing statute, is barred if the statute of limitations has run in one where the defendant was available for suit, at least when the one is the state of plaintiff's residence. Such a rule avoids the mechanical nature of the single place of arising theory, allows the defendant to ascertain the applicable time period with certainty while affording the plaintiff a fair opportunity to sue in a convenient forum, and prevents local courts from being cluttered with actions that could have been brought elsewhere but are now time-barred there—particularly actions by out-of-state plaintiffs who had a fair opportunity to sue in their home state but delayed too long, as was the case here.

478 F.2d at 368.

NRC is an "out-of-state" plaintiff "who had a fair opportunity to sue in [its] home state but delayed too long. . . ."

NRC's claim is time-barred under the Colorado statute of limitations, made applicable by the New York borrowing statute. Accordingly, defendant Royal's motion for summary judgment dismissing the complaint is granted.

It is so ordered.