A. Bruce LANG, Plaintiff,

v.

PAINE, WEBBER, JACKSON & CUR-
TIS, INCORPORATED, Defendant.

No. 83 Civ. 919 (WCC).

United States District Court,
S.D. New York.

March 26, 1984.

Ray L. LeFlore, New York City, for plaintiff; Herbert S. Zischkau, III, White Plains, N.Y., of counsel.

Gaston, Snow, Beekman & Bogue, New York City, for defendant; Martin P. Unger, Charles M. Mattingly, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiff A. Bruce Lang ("Lang") commenced this action on February 3, 1983 against defendant Paine, Webber, Jackson & Curtis, Incorporated ("Paine Webber"), alleging federal claims for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Act") and a common law claim for breach of fiduciary duty.[1] The dispute concerns the manner in which plaintiff's brokerage account was handled during the period March 1978 through March 1980. The case is currently before the Court on defendant's motion for partial summary judgment on the ground that plaintiff's federal securities law claims are barred by the applicable statute of limitations insofar as they are based upon pre-February 3, 1980 transactions. For the reasons stated below, the motion is granted in part.

## I.

■ Because the Act does not provide a limitations period, I must look to the law of New York, as the forum state, to determine whether any of plaintiff's claims are time-barred. *Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977); *Haberman v. Tobin,* 466 F.Supp. 447, 449 (S.D.N.Y.1979); *Natural Resources Corp. v. Royal Resources Corp.,* 427 F.Supp. 880, 882 (S.D.N.Y.1977). Reference to New York law also includes resort to its borrowing statute, *e.g., Sack v. Low,* 478 F.2d 360, 365 (2d Cir.1973), which provides that:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state

where the cause of action accrued, except where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y.Civ.Prac.Law § 202 (McKinney 1972). The avowed purpose of § 202 is "to protect New York resident-defendants from suits in New York that would be barred by shorter statutes of limitations in other states where non-resident-plaintiffs could have brought suit." *Stafford v. International Harvester Co.,* 668 F.2d 142, 151 (2d Cir.1981) (emphasis omitted), *quoting Sack,* 478 F.2d at 367. Thus, it prevents forum shopping by a nonresident.

It is uncontested that Lang is a Canadian citizen, residing in Ottawa. Consequently, the borrowing statute bars his claim if it accrued in a jurisdiction outside of New York and the limitations period in that jurisdiction has expired. The Court must, therefore, examine the facts underlying this dispute in order to ascertain where plaintiff's claims accrued for purposes of the borrowing statute.

## II.

In the context of a motion for summary judgment, the Court cannot, of course, resolve disputed issues of fact, but can only determine whether there are issues of fact to be tried. *See SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). In making this determination, the Court will consider affidavits, depositions, interrogatory answers, and admissions, but will not give any effect to mere conclusory allegations or denials or to unsubstantiated assertions. *Id.* When the moving party comes forward with evidence supporting a particular assertion, his "opponent cannot rest on the allegations of the complaint but must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts." *Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir.1972).

---

1. Plaintiff's wife, Sheila Lang, filed a similar action, also pending before me. *See Lang v.* *Paine, Webber, Jackson & Curtis, Incorporated,* 83 Civ. 920 (WCC).

In support of its motion, Paine Webber has submitted a Local Rule 3(g) statement[2] of undisputed facts, supported by excerpts from the deposition of plaintiff, Rule 36 admissions by plaintiff, and copies of relevant monthly statements and confirmation slips for plaintiff's account. Although Lang did not file either a countervailing Rule 3(g) statement, as required by the rules of this Court, or any affidavits contradicting Paine Webber's factual showing, he wastes considerable time arguing that the Court should not consider his deposition at this stage because his attorney has not been afforded an opportunity for cross-examination. That argument is utterly without merit. Because the deposition on which defendant seeks to rely is that of plaintiff himself, Lang is uniquely qualified to disavow any of the statements defendant has submitted. If Lang now disputes any of his testimony from that deposition, or if he believes that his words have been misconstrued or taken out of context, he has had ample opportunity to file an affidavit controverting Paine Webber's evidentiary showing. Having failed to do so, the Court can only assume that he accedes to Paine Webber's presentation. Moreover, under Rule 801(d)(2)(A), F.R.E., an admission of a party-opponent is always admissible against him. Thus, there exists absolutely no reason to preclude defendant's use of plaintiff's deposition in support of the instant motion.

### III.

Paine Webber has demonstrated the following uncontroverted facts relevant to the question of where and when Lang's claims accrued:

In March 1978, Lang opened a brokerage account with Paine Webber's Boston, Massachusetts office, following a telephone conversation with Russell Kramp ("Kramp"), an account executive in that office. See Lang Dep. at 177, 774; Def. Rule 3(g) Statement at ¶ 3. Plaintiff opened the account by withdrawing approximately $25,000 he had on deposit in an account at the Pacific National Bank in Nantucket, Massachusetts, and using it to purchase through Paine Webber 500 shares of stock in the Monsanto Company on March 21, 1978.[3] See Lang Dep. at 774–75, 823; Def.Rule 3(g) Statement at ¶ 3; Pl. Ans. to Def. Requests for Admissions at ¶ 7. All of the documents that Lang was required to sign in order to open and maintain his account—including a customer's agreement, a declaration of nonresidence, and an option agreement and qualification form—were prepared by Paine Webber in Boston, forwarded to Lang in Ottawa for signature, and ultimately returned to Kramp in Boston. See Kramp Aff. at ¶ 3.

Although Lang lived in Canada, he had maintained the Nantucket bank account since at least the early part of 1977 as a hedge against political events in Canada and a possible decline in the value of the Canadian dollar relative to United States currency. See Lang Dep. at 375–76; Def. Rule 3(g) Statement at ¶ 2. In fact, part of the money Lang had on deposit with the Pacific National Bank was money he had borrowed from the Royal Bank in Canada for the express purpose of removing his funds to the United States. See Lang Dep. at 375–76. As plaintiff himself stated:

[W]e have a prime minister up there who I find very unacceptable and at this time [1977] the Canadian dollar was trading at about 94 cents to the dollar and the horrendous expenditures of this government was [sic] such that it was generally felt that the dollar would go down to 75 cents where it is roughly today. And so I discussed it with my wife, we decided it

---

**2.** Under Rule 3(g) of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York, any motion for summary judgment must be accompanied by a short statement of the material facts which the moving party contends are not in dispute. The party opposing the motion is required to respond with a statement of facts that it asserts are disputed. All facts set forth in the moving party's statement are deemed admitted unless controverted by the opposing party. Lang has not submitted any statement pursuant to this rule; accordingly, the facts set forth in Paine Webber's statement will be deemed admitted by Lang.

**3.** Unless otherwise noted, references are to trade dates and not settlement dates.

would be wise to secure some money in the States in case the worse happened. Lang Dep. at 376. To this day, Lang continues to maintain that bank account in Massachusetts, albeit with a far less substantial balance than existed at the time he began trading with Paine Webber in 1978. *See* Lang Dep. at 370–71; Pl.Ans. to Def. Requests for Admissions at ¶ 6.

The activity in plaintiff's account began with the purchase of the Monsanto stock on March 21, 1978 and concluded with the sale of Hardwicke warrants on August 5, 1981. Throughout the less than three and one-half years the account was open, Lang engaged in 82 separate trades and paid commissions to Paine Webber totalling $20,509.45. *See* Def.Exs. E and F. Sixty-seven of those trades were settled prior to February 3, 1980,[4] and they accounted for $15,667.85, or approximately 76% of the total commissions earned on the account. *See id.* During the period Lang was trading through Paine Webber, he apparently contributed additional money to his account beyond the $25,000 he used to fund his initial purchase. *See, e.g.,* Lang Dep. at 775. Although the source and total amount of those added contributions is unclear from the record before me, all such infusions of fresh capital were sent to Paine Webber in Boston. *See* Pl.Ans. to Def.Requests for Admissions at ¶ 8.

All trades for Lang's account were directed by Kramp from his office in Boston. *See* Kramp Aff. at ¶ 4. On the day following each trade, Lang was sent a written confirmation of the transaction, and at the end of each month he was mailed a statement listing his current securities positions and detailing all activity in the account since the date of the prior month's statement. *See* Kramp Aff. at ¶¶ 4–5; Def.Rule 3(g) Statement at ¶ 5; Lang Dep. at 20; *see generally, e.g.,* Def.Exs. D and F. On many occasions, Lang and Kramp had telephone conversations in which they discussed the status of plaintiff's account. *See* Def.Rule 3(g) Statement at ¶ 6; Lang Dep. *passim.* Kramp participated in all such conversations from Boston, whereas Lang was at different times in Ottawa, Massachusetts, and Florida when he spoke with Kramp. *See* Kramp Aff. at ¶ 2; Pl. Ans. to Def.Requests for Admissions at ¶¶ 1(b)–(e); Def.Rule 3(g) Statement at ¶ 6. In addition, Lang independently attempted to monitor the activity in his account, although the level of his scrutiny varied at different stages during the 3½-year period he maintained his account with Paine Webber. *See, e.g.,* Lang Dep. at 679. He sometimes followed prices of the stocks he owned in a Canadian newspaper, and, when he had invested in securities not listed in the Canadian press, he would sometimes follow them by purchasing *Barrons* or the *Wall Street Journal.* *See* Lang Dep. at 605–06, 683. Moreover, as a result of certain events that had a negative impact on his account balance, Lang followed the price of his stocks more closely, *see* Lang Dep. at 678–79, 682–83 and, for a period of time, he performed his own computations in an effort to keep track of his margin balance. *See* Lang Dep. at 131–34, 144–45.

## IV.

In determining where a cause of action "accrues" for purposes of applying § 202 of the CPLR, courts have suggested two different approaches. Some courts have applied "modern" conflict of laws principles to the borrowing statute. *See Haberman v. Tobin,* 466 F.Supp. 447, 449–50 (S.D.N.Y.1979); *Natural Resources Corp. v. Royal Resources Corp.,* 427 F.Supp. 880, 882–86 (S.D.N.Y.1977); *Martin v. Julius Dierck Equipt. Co.,* 52 A.D.2d 463, 384 N.Y.S.2d 479, 482 (1976), *aff'd on other grounds,* 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978). Under this approach—denominated the "grouping of contacts" or "center of gravity" doctrine and applied generally in New York to conflict of laws problems in multi-state tort cases—the court compares the "contacts" and "interests" of the various jurisdictions in the litigation, in the context of the issue

---

**4.** The last trades to settle prior to February 3, 1980 were the January 24, 1980 purchase of Chrysler stock and the same day's sale of Occi-dental Petroleum warrants. *See* Def.Ex. E at 5; Def.Ex. F.

presented. *See Babcock v. Jackson,* 12 N.Y.2d 484, 240 N.Y.S.2d 743, 749–50, 191 N.E.2d 279 (1963). The virtue of this rule "is that 'it gives to the place "having the most interest in the problem" paramount control over the legal issues arising out of a particular factual context' and thereby allows the forum to apply 'the policy of the jurisdiction "most intimately concerned with the outcome of [the] particular litigation".' " *Id.* at 749, 191 N.E.2d at 283, *quoting Auten v. Auten,* 308 N.Y. 155, 161, 124 N.E.2d 99 (1954).

The alternative approach to the inquiry is to apply the historical and simple rule that the place of injury determines where a tort cause of action accrues for purposes of the borrowing statute. *See, e.g., Industrial Consultants, Inc. v. H.S. Equities, Inc.,* 646 F.2d 746, 747 (2d Cir.1981); *Arneil v. Ramsey,* 550 F.2d 774, 779–80 (2d Cir.1977); *Bache Halsey Stuart, Inc. v. Namm,* 446 F.Supp. 692, 696–97 (S.D.N.Y.1978); *Knieriemen v. Bache Halsey Stuart Shields, Inc.,* 74 A.D.2d 290, 427 N.Y.S.2d 10, 14 (1980). As explained by another Judge of this Court, the "place of injury" rule derives from the older conflict of laws concept of *lex loci delictus, Namm,* 446 F.Supp. at 696, and it has been criticized for the mechanical nature of its application, *see, e.g., Haberman,* 466 F.Supp. at 450.

Unfortunately, the New York Court of Appeals has not had the opportunity to decide which of these two approaches it would follow in analyzing where a claim "accrued" for purposes of applying the borrowing statute.[5] Thus, the preliminary inquiry, in the federal courts at least, has been to ascertain which rule the New York Court of Appeals would follow. Although some lower courts—apparently motivated by the conviction that the "grouping of contacts" approach consistently provides far more rational results than the old "place of injury" rule—have hypothesized that New York's highest court would apply the "modern" conflict of laws analysis to the borrowing statute, the Second Circuit Court of Appeals has consistently held that it would not. *Compare Haberman,* 466 F.Supp. at 450; *Natural Resources,* 427 F.Supp. at 884; *Martin,* 384 N.Y.S.2d at 482 (grouping of contacts approach), *with Stafford,* 668 F.2d at 150; *Industrial Consultants,* 646 F.2d at 747; *Arneil,* 550 F.2d at 779–80; *Sack,* 478 F.2d at 366; *Posner v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.Supp. 972, 979 (S.D.N.Y.1979) ("place of injury" rule). Although there is much persuasive appeal in the reasoning of those courts that have adopted the "grouping of contacts" test for determinations under § 202, I am constrained by the rulings of the Court of Appeals for this Circuit to apply the "place of injury" test to determine where Lang's claims "accrued." Nevertheless, this choice does not, in the instant case, affect the outcome, which is the same under both the "place of injury" and the "grouping of contacts" rules.

■ As previously mentioned, under the "place of injury" rule, a cause of action for fraud arises where the loss is suffered. *Sack,* 478 F.2d at 366. That loss "is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence." *Id.; see Arneil,* 550 F.2d at 779; *Natural Resources,* 427 F.Supp. at 882 (accrues where plaintiff's pocketbook is situated). However, the plaintiff's residence need not necessarily be the situs of the economic impact of the fraud, and the court can properly consider all relevant factors in determining where the loss is felt. *See*

---

5. Some writers, however, believe that the New York Court of Appeals implicitly adopted the "grouping of contacts" approach by virtue of its affirmance in *Martin v. Julius Dierck Equipt. Co.,* 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978), *aff'g,* 52 A.D.2d 463, 384 N.Y.S.2d 479 (1976). *See Natural Resources,* 427 F.Supp. at 883–84; J. ·McLaughlin, Supp.Prac.Comm. to N.Y.Civ.Prac.L. § 202 at 31–32 (McKinney Supp. 1983–84). *But see, e.g., Stafford,* 668 F.2d at 149. Upon close reading, it is clear that the Court of Appeals' decision in *Martin* addressed only the question whether a warranty claim can accrue separately from a negligence or strict liability cause of action, and did not consider whether the Appellate Division correctly applied the "grouping of contacts" test to the borrowing statute. *See Stafford,* 668 F.2d at 149; *see generally Martin,* 403 N.Y.S.2d 185, 374 N.E.2d 97. Thus, with all deference to the expertise of Dean (now Judge) McLaughlin, I cannot accept his reading of *Martin.*

*Sack,* 478 F.2d at 367–68 (court can consider how plaintiff paid for securities, where plaintiff maintained accounts, and other factors relevant to how securities were handled in determining where cause of action arose under traditional test).

Although Lang resides in Ottawa, insofar as this case is concerned, his financial base is in Massachusetts. He funded his Paine Webber account with money that he had previously taken out of Canada for the express purpose of maintaining an investment in American dollars. Lang's initial, and most substantial, investment of $25,000 was transferred directly from a bank account he held in Nantucket, Massachusetts. He chose to move his funds from that ordinary bank account into the stock market in order to increase the potential yield on the capital he had placed in this country. *See* Lang Dep. at 177. Moreover, Lang opened and maintained his brokerage account exclusively with the Boston office of Paine Webber, and all trades for plaintiff's behalf were directed by Kramp from that Massachusetts office.

Thus, Lang was investing through Paine Webber in Massachusetts money that, for the most part, he had previously kept in that state. The direct loss from the securities transactions at issue here was imposed primarily on the balance of funds Lang had remaining in Massachusetts; any such injury was only indirectly felt in Canada. Under these circumstances, I must conclude that the place of injury in this case was Massachusetts, the situs of Lang's American bank account, his brokerage account, and the Paine Webber office through which all trades were placed, and not Ottawa, which is his residence.

It perhaps should be noted that if Lang's claim had arisen in Canada, so that the Canadian statute of limitations controlled, plaintiff's entire claim would apparently be time-barred. It appears that under § 135 of the Securities Act of Ontario, which defendant has submitted to the Court, an action for securities fraud must be brought within 180 days after plaintiff acquires knowledge of the facts giving rise to the cause of action.[6] *See* Can.Sec.L.Rep. (CCH) ¶ 50–408 at 9507 (supplied as appendix A to Paine Webber Reply Memo). As discussed more fully below, Lang clearly had knowledge of all the relevant facts far more than 180 days prior to the date he instituted this action. Although Lang's attorney asserts that Lang could not have obtained personal jurisdiction over Paine Webber in Canada and thus could not have brought suit there, he has cited no authority to justify that improbable proposition.[7] Surely if Paine Webber is deemed to have caused injury in Canada it would be subject to the laws of that country. Thus I conclude that there is no basis for applying the *Stafford* rule[8] to prevent reference to the Canadian statute of limitations. Accordingly, if Lang were to prevail in his contention that his injury occurred in Canada, his entire action would have to be dismissed as time-barred.

If, on the other hand, I applied "modern" conflict of laws principles, I would still conclude that Lang's cause of action "accrued" in Massachusetts. Under the "grouping of contacts" approach, the Court does not merely "list the contacts, tot them up, and choose the limitations statute of the state whose list is longer." *Arneil,* 550 F.2d at 779. Rather, as explained by the New York Court of Appeals,

> When ... we rejected the mechanical place of injury rule ... we were willing to sacrifice the certainty provided by the old rule for the more just, fair and practi-

6. Under Rule 44.1, F.R.Civ.P., the Court may consider any relevant material or source in resolving a question of foreign law, whether or not admissible under the Federal Rules of Evidence.

7. Lang has simply not provided the Court with any evidence that Lang could not have sued in Canada other than that the Canadian statute of limitations had already run. *Cf. Arneil,* 550

F.2d at 780 (Plaintiffs failed to show any reason they could not sue in home state other than fact that statute of limitations had run.)

8. In *Stafford,* the Court of Appeals held that New York's borrowing statute does not require the application of the statute of limitations of a jurisdiction if a cause of action could never have been brought in that jurisdiction. *See Stafford,* 668 F.2d at 152.

cal result that may best be achieved by giving controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation.

*Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454 (1972).

Here, the only jurisdiction with an interest in applying its statute of limitations is Massachusetts. New York's only interest in this case, to the extent it has any, is in the application of its borrowing statute to protect its resident defendants from forum shopping by nonresident plaintiffs. *See Arneil,* 550 F.2d at 779–80; *Sack,* 478 F.2d at 367. The few New York contacts with this litigation are at best indirect, and do not serve to enhance this state's interest.[9] Canada likewise has no interest in having its shorter statute of limitations applied to this dispute. All of the policies promoted by enforcement of a statute of limitations—*e.g.,* certainty and repose—operate to the benefit of a defendant. Thus, a jurisdiction would have an interest in applying its statute of limitations to protect its resident defendant from an untimely suit. Here, however, Canada has no resident defendant to protect. Instead, application of the shorter Canadian limitations period would deprive a Canadian plaintiff of his right to sue—a result which would surely not advance any interest of Canada.

Massachusetts' interest in having its statute of limitations applied to this litigation is, however, clear and persuasive. All of the actions complained of by plaintiff here were undertaken by a Massachusetts defendant within that state. Massachusetts thus has a strong interest in ensuring that, at a definite point in time, its residents can no longer be subjected to suit for their actions, which is plainly implicated by the instant facts. Accordingly, under a "grouping of contacts" approach to the borrowing statute, the Massachusetts statute of limitations would apply, just as it would under a "place of injury" test.

■ Under Massachusetts law, the state cause of action most closely analogous to a claim under § 10(b) of the Act provides for a three-year limitations period. *See* Mass. Gen.Laws ch. 260 § 2A; *Cook v. Avien, Inc.,* 573 F.2d 685, 694, 694 n. 20 (1st Cir.1978). By contrast, the analogous New York statute of limitations for fraud would allow plaintiff six years to commence an action. *See* N.Y.Civ.Prac.Law § 213(8) (McKinney Supp.1983–84). Thus, the New York borrowing statute mandates that the shorter Massachusetts limitations period govern an action commenced in New York.

■ While state law determines the length of the limitations period applicable to an action under § 10(b) of the Act, federal law determines when that period begins to run. *E.g., Arneil,* 550 F.2d at 780; *Namm,* 446 F.Supp. at 698. Under federal law, "the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme." *Arneil,* 550 F.2d at 780, *quoting Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970). Thus, the Court must determine when, in the exercise of reasonable diligence, plaintiff should have learned sufficient facts to put him on notice of the existence of the alleged fraud. *See Arneil,* 550 F.2d at 780–81. If the Court cannot make this determination as a matter of law, it cannot properly grant a motion for summary judgment.

■ Insofar as Lang is asserting a claim for unauthorized trading by defendant, the only relevant issue is whether each trade was or was not authorized. Therefore, in order to have knowledge of the existence of the fraud, all plaintiff needed was knowledge that the allegedly unauthorized trades had taken place. Here, Lang clearly had, prior to February 3, 1980, constructive, if not actual, knowledge of defendant's allegedly unauthorized activity as to all trades in his account through January 24, 1980: All trades through that date were

---

**9.** Lang received printed material, such as his computer-generated monthly statements and confirmation slips, directly from Paine Webber's New York headquarters. Paine Webber also performed certain supervisory functions in

New York. In addition, Lang's trades were ultimately executed through the facilities of various stock exchanges located in New York. These contacts are, however, only tenuously related to the merits of the underlying dispute.

settled prior to February 3, 1980; the day following each trade plaintiff was sent a confirmation slip which gave him all facts concerning the trade; and at the end of every month plaintiff was sent a statement which again advised him of all trades that had been executed on his behalf during the prior month. Lang was thus clearly on notice that these trades had taken place; whether he in fact read the confirmations and statements that were mailed to him is irrelevant, because I find as a matter of law that any ordinary investor would, in the exercise of reasonable diligence, have done so. Accordingly, plaintiff's claims are, to the extent they are based upon unauthorized trading through January 24, 1980, dismissed as time-barred.

■ Lang's claim of churning, however, must be treated differently. A claim of churning is based upon an excessive volume of discretionary trading in an account over a period of time. Discovery of the fraud requires not only knowledge that the trades have occurred, but also an awareness that the rate of trading activity is excessive in light of the dollar value of the account and the client's investment objectives. Determining the precise point at which an investor has enough information to ascertain that the level of trading in his account is excessive depends, to a large degree, upon the investor's sophistication: While a seasoned investor might realize immediately upon receipt of several confirmation slips that his account is being churned, the unwary novice might reasonably need considerable time. It may also depend, to some extent, upon the nature of the relationship between the broker and his client, the extent of discussion between them and the degree to which the client relies upon the unfettered discretion of the broker. In short, deciding when an investor should in the exercise of reasonable diligence have discovered that he has a cause of action for churning necessarily involves consideration of a complex of evidentiary factors. In the instant case, without hearing the evidence at trial, I am unable to state as a matter of law when Lang should have realized, on the basis of the information known or available to him,

that he had a claim for churning. Accordingly, any ruling on this aspect of defendant's motion will be deferred until trial.

The parties are directed to proceed with their discovery and to be prepared to commence trial on July 23, 1984.

SO ORDERED.