Burton POSNER and Iris N. Posner, Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. and Lionel D. Edie & Co., Inc., Defendants.

No. 76 Civ. 5084–CSH.

United States District Court, S. D. New York.

April 26, 1979.

Joseph M. Pogostin, New Rochelle, N. Y., for plaintiffs.

Thomas W. Smith, Joanne Welty, New York City, for defendants.

## MEMORANDUM OPINION & ORDER

HAIGHT, District Judge:

Defendants' omnibus motion under Rules 12(b)(1) and (6), 12(c) and 56, Fed.R.Civ.P., seeking dismissal of this action on various grounds, raises interesting if not altogether novel questions of law under the Securities Act of 1933 (the 1933 Act), 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78a *et seq.* Before proceeding to a discussion of these legal questions, a summary of the facts, essentially undisputed for the purpose of this motion, is in order.[1]

### I.

Plaintiffs Burton and Iris Posner, husband and wife, are residents of the State of Arkansas who maintain a place of business in Memphis, Tennessee. On February 27, 1969, plaintiffs opened a securities account with defendant Merrill Lynch, a Delaware corporation with its principal place of business in New York, through Merrill Lynch's Memphis, Tennessee office. Arthur J. Livingston, a Merrill Lynch salesman employed at the Tennessee office, was the account executive in charge of the Posner account.

In a June 1, 1971 letter to Mr. Posner at an Earle, Arkansas address, Mr. Livingston suggested that the Posners might be interested in a "new service" provided by defendant "Lionel D. Edie and Company, the investment counselling subsidiary of Merrill Lynch . . . providing full discretionary management . . . to customers with investment portfolios of $25,000 or more."[2] The Posners apparently acted on their broker's suggestion. On June 8, 1971, they executed two documents: the first, an account management agreement between the Posners and Edie, retaining Edie to manage the Posners' portfolio and naming Merrill Lynch custodian to carry out transactions as authorized by Edie;[3] the second, a limited power of attorney appointing Edie as the Posners' attorney-in-fact to manage the Posners' Merrill Lynch account.[4]

The account management agreement became operative on June 15, 1971, and terminated on October 4, 1972, the date that Edie received notice of the Posners' decision to cancel the agreement.[5] The Posners' letter terminating the agreement was dated September 29, 1972, bore an Earle, Arkansas address, and was directed to Edie in New York with a copy to Mr. Livingston in Tennessee.[6]

During the period that the agreement was in effect, Edie authorized numerous transactions in the Posners' account which were consummated by Merrill Lynch as broker-custodian. Defendants assert (and provide supporting documentation) that Merrill Lynch forwarded confirmations of account transactions to the Posners at their Arkansas address and provided the Posners with monthly statements summarizing transactions in the account for each such monthly period. Edie has submitted copies of various billing statements for its service management fees, which were sent to the Posners in Earle, Arkansas.

---

1. The record on this motion, from which the facts are drawn, consists of the following: Affidavit of Joanne Welty, Counsel for Defendants, December 7, 1977, and exhibits thereto; Affidavit of Denis J. Dooley II, Vice President, Lionel D. Edie & Co., Inc., November 30, 1977, and exhibits thereto; Affidavit of Gene C. Williams, Assistant Vice President, Merrill Lynch, Pierce, Fenner & Smith, Inc., November 28, 1977, and exhibits thereto; Affidavit of Joanne Welty, January 18, 1978, and exhibits thereto; Affidavit of Denis J. Dooley II, January 18, 1978, and exhibits thereto; Affidavit of Joseph M. Pogostin, Counsel for Plaintiffs, January 11, 1978, and exhibits thereto; and various memoranda of law.

2. Pogostin Affidavit, Exhibit I.

3. Dooley Affidavit, November 30, 1977, Exhibit A.

4. *Id.* Exhibit B.

5. Stipulation between Brian F. Amery, Attorney for Defendants, and Joseph M. Pogostin, Attorney for Plaintiffs, Welty Affidavit, December 7, 1977, Exhibit B.

6. Dooley Affidavit, November 30, 1977, Exhibit C.

The parties have stipulated [7] that the value of the Posner account on June 15, 1971 (the date Edie assumed control) was $38,612.50 and that its value on October 4, 1972 (the date the Posners resumed control) was $32,371.50.

Plaintiffs' dissatisfaction with the handling of their account apparently prompted the cancellation of their agreement with Edie. Further, they placed the matter in the hands of their attorney. By letter dated August 8, 1973, Kent J. Rubens, an Arkansas attorney, informed defendants that his "office has been associated by Memphis counsel with regard to an account handled by [Edie] for the benefit of the Posners. . . . At this time I want to put both [Edie] and Merrill Lynch on notice that the Posners are asking this office to investigate the handling of their account. There seems to be the possibility that the stocks may have been churned and/or there was a breach of fiduciary duty in that the stated purpose of the account was for investment as the Posners were not traders." [8]

On April 22, 1974, the Posners brought suit in the United States District Court for the Western District of Tennessee, naming Merrill Lynch, Edie and Arthur Livingston as defendants. The suit was based on the same alleged mishandling of the Posners' account that forms the basis of the instant litigation. It charged defendants with violations of the 1933 Act, the 1934 Act and Rule 10b–5, and sought recovery of lost profits, lost income, fees paid to defendants, and punitive damages.[9] By order dated

February 12, 1975, the Tennessee District Court granted a motion to quash the return of service on Edie, on the ground that plaintiffs had failed to establish that Merrill Lynch was Edie's agent for service of process.[10] Defendants assert that this order constituted a dismissal of the action without prejudice; it does not appear that the Tennessee action was further prosecuted.

On November 12, 1976 plaintiffs instituted this action. The "four count" complaint here premises jurisdiction on section 22 of the 1933 Act, 15 U.S.C. § 77v, section 27 of the 1934 Act, 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331 and 1337, and diversity of citizenship, 28 U.S.C. § 1332. Count I seeks to recover losses in the plaintiffs' account based on the defendants' alleged violations of the federal securities laws; Count II seeks the same damages based on breach of contract, breach of fiduciary duty and common law fraud; Count III seeks the recovery of the lost investment potential of plaintiffs' capital based on the allegedly fraudulent mismanagement of their account; and Count IV seeks punitive damages for fraud.

The gist of plaintiffs' factual contentions is that Edie, with the aid of its parent corporation Merrill Lynch, fraudulently secured discretionary management of plaintiffs' account; that Edie then fraudulently mismanaged the account, turning a portfolio of high quality long-range growth and income stock into one of highly volatile and risky securities,[11] "churned"[12] the account

---

7. See note 5, *supra*.

8. Dooley Affidavit, November 30, 1977, Exhibit D.

9. Welty Affidavit, January 18, 1978, Exhibit A.

10. *Id.* Exhibit B.

11. The parties agree that, when turned over to Edie, the Posners' portfolio consisted of the following securities: AT&T (300 shares); International Harvester (100); Kroger (100); Monsanto (100); Sun Beam (150); Union Carbide (100); U.S. Steel (150).

When returned to the Posners' control, the portfolio contained the following assertedly "volatile and risky" securities: Combined Insurance (214); Holiday Inns (100); Household

Finance (150); IBM (20); Rank Organization (100); Westinghouse (40). Stipulation, *supra* note 5.

12. "Churning," a "manipulative, deceptive . . . fraudulent device" under § 15(c) of the 1934 Act, 15 U.S.C. § 78o, is defined by the SEC as "any act of any broker, dealer or municipal securities dealer designed to effect with or for any customer's account in respect to which such [person] or his agent or employee is invested with any discretionary power any transactions or purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account." 17 C.F.R. § 240.15c1–7(a) (1978 ed.) *See generally*, Note, *Churning by Securities Dealers*, 80 Harv.L.Rev. 869 (1967).

to generate commissions for Merrill Lynch, and bought and sold securities for plaintiffs' account as though plaintiffs were traders rather than investors, all in violation of the contract between the parties, and state and federal law.

## II.

Under the first count of the complaint, plaintiffs assert violations of "15 U.S.C. 77(e) and (q)(aa)(v)," section 10 of the 1934 Act and Rule 10b–5, 17 C.F.R. § 240.10b–5. Defendants, in what I take to be a curative motion, seek dismissal of various of these claims under Fed.R.Civ.P. 12(b)(6) for failure to state claims upon which relief can be granted.

Plaintiffs' submissions on this motion make clear that recovery is sought for violations of the general anti-fraud provisions of the federal securities laws, common law fraud, and breach of contract. There are no allegations in this case relevant to violations of 15 U.S.C. §§ 77e and 77aa, which concern the registration of securities under the 1933 Act. Indeed, the only reference to these provisions is plaintiffs' conclusory statement, in paragraph 16 of the complaint, that they were violated. Since these alleged violations are unsupported by any factual allegations, any claims based on 15 U.S.C. §§ 77e and 77 aa are dismissed.

With respect to claims asserted under 15 U.S.C. §§ 77v and 78aa I simply note that these are the jurisdictional provisions of the 1933 and 1934 Acts respectively. As such, they create no substantive rights and any "claims" based on these provisions are likewise dismissed.

What remain are the federal securities fraud claims based on § 17(a) of the 1933 Act, § 10 of the 1934 Act and Rule 10b–5, and the common law fraud, breach of contract, and breach of fiduciary duty claims.

## III.

Defendants move for dismissal of the § 17(a) claim on the ground that that section does not support an implied private cause of action. I am foreclosed from agreeing with defendants on this point by virtue of the Second Circuit's recent decision in *Kirshner v. U.S.A.*, No. 77–6104 (2d Cir. Nov. 30, 1978), upholding a private claim under § 17(a). There, the Court noted "that there [is] little practical point in denying the existence of an action under § 17 once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934 Act." *Id.*, at —— (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir. 1968) (Friendly, J., concurring) ).

The *Kirshner* panel implicitly recognized that an implied private cause of action under § 17 runs only in favor of an aggrieved buyer of securities, whereas a 10b–5 claim may be raised by either buyers or sellers. (*Compare* 15 U.S.C. § 77q *with* Rule 10b–5).[13] In this case, plaintiffs' complaint alleges fraudulent conduct on de-

13. Section 17(a) provides:
"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
"(1) to employ any device, scheme, or artifice to defraud, or
"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

Rule 10b–5 reads:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
"(a) To employ any device, scheme, or artifice to defraud,
"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

fendants' part, injuring them in their capacity as both buyers and sellers of securities. Since they have pled their status as both, and the scienter required for a Rule 10b–5 action, knowledge and intent to defraud, *e. g. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), *Kirshner* precludes dismissal of the § 17(a) claim on the ground asserted.[14]

### IV.

Defendants next seek dismissal of the federal and common law fraud claims and the breach of fiduciary duty claim, on the ground that they are time barred under the applicable statute of limitations.

■ Because the federal securities laws do not provide a limitations period applicable to private claims asserted under § 17 of the 1933 Act or § 10 of the 1934 Act and Rule 10b–5, I must look to the law of the forum state, New York, to determine whether those claims were timely brought. *Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir. 1977) (citing *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 703–04, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Cope v. Anderson*, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); *Sack v. Low*, 478 F.2d 360, 365 (2d Cir. 1973) (10b–5 claim)). *See Mittendorf v. J. R. Williston & Beane Inc.*, 372 F.Supp. 821, 830 (S.D.N.Y.1974) (Rule 10b–5 and § 17 claim). *See also, Malik v. Universal Resources Corp.*, 425 F.Supp. 350 (S.D.Cal.1976). Resort to New York law includes reference both to that State's substantive statutes of limitations for fraud claims, N.Y.C.P.L.R. §§ 213(8) and 203(f), and to the New York borrowing statute, N.Y.C.P.L.R. § 202. *Arneil v. Ramsey, supra*, 550 F.2d at 779 (citing *Cope v. Anderson, supra*). These principles apply with respect to plaintiffs' common law fraud claim as well. *Arneil v.*

*Ramsey*, 414 F.Supp. 334, 340 (S.D.N.Y. 1976), *aff'd*, 550 F.2d 774 (2d Cir. 1977).

New York's borrowing statute provides in substance that when a cause of action accrues outside New York to a non-resident plaintiff, suit is barred in New York if the action is untimely under either New York law or the law of the state where the cause of action arose, N.Y.C.P.L.R. § 202. The borrowing statute is triggered by three factors: a non-resident plaintiff who sues in New York on a "foreign" cause of action. In this case, the first two factors are concededly present. Thus, to ascertain the applicable limitations period, I must decide where plaintiffs' causes of action for fraud accrued.

With respect to plaintiffs' federal statutory fraud claims, the Second Circuit has recently stated:

> "In *Sack v. Low*, [478 F.2d 360, 366 (2d Cir. 1973)] this Court, in the absence of New York decisions directly in point, decided that a cause of action for fraud under Section 10(b) of the Exchange Act arises where 'its economic impact is felt, normally the plaintiff's residence.' We find nothing to indicate that New York law has changed in this respect . . . and we apply the *Sack* rule here." *Arneil v. Ramsey, supra*, 550 F.2d at 779.

Under *Arneil*, plaintiffs' § 17 and Rule 10b–5 claims would "normally" be deemed to have accrued in Arkansas, the state of plaintiffs' residence at all relevant times.

On the issue of plaintiffs' common law fraud claims, there is language in *Sack v. Low* to the effect that New York, under a modern choice of laws approach, might apply its own substantive law in determining culpability for non-statutory fraud. *See* 478 F.2d at 366. But, both *Sack v. Low* and *Arneil v. Ramsey* make clear the Circuit's view that New York would nonetheless ap-

---

14. The Supreme Court's decision in *International Brotherhood of Teamsters v. Daniels*, —— U.S. ——, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), holding that the federal securities laws do not apply to a non-contributory, compulsory pension plan, implicitly overrules *Kirshner*. It does not, however, disturb the Second Circuit's

holding on the § 17(a) issue: "The [Seventh Circuit] and the District Court also held that § 17(a) provides private parties with an implied cause of action for damages. In light of our disposition of this case, we express no views on this issue." *Daniels, supra*, —— U.S. at —— n.9, 99 S.Ct. at 795 n.9.

ply the "place of injury" rule to determine where a common law fraud claim arose for borrowing statute purposes. *See* 550 F.2d at 779–80 and 478 F.2d at 366–67.

The question before me in this case is whether recent developments in New York law vitiate the *Arneil v. Ramsey* holding. In other words, I must decide whether New York would now apply to borrowing statute questions, the "interest analysis" approach to choice of laws decisions pioneered in *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), rather than the traditional *lex loci delictus* rule.

At least one district court and one leading commentator are of the opinion that "[m]odern conflict of laws thinking has finally had some impact on the borrowing statute." *Natural Resources Corp. v. Royal Resources Corp.*, 427 F.Supp. 880, 883 (S.D. N.Y.1977) (per Ward, D. J.). *See also J. M. McLaughlin*, 1976 Supp. Prac. Commentaries to *N.Y.C.P.L.R. § 202* (McKinney Supp. 1978–79). Both Dean McLaughlin and Judge Ward placed primary reliance on the decision of the New York Supreme Court, Appellate Division, Second Department, in *Martin v. Julius Dierck Equip. Co.*, 52 A.D.2d 463, 384 N.Y.S.2d 479 (2d Dept. 1976), *aff'd*, 43 N.Y.2d 583, 403 N.Y.S.2d 185 (1978). Were the Second Department's opinion in *Martin* the last word on New York's approach to where causes of action accrue for borrowing statute purposes, I might be inclined to agree with Dean McLaughlin that, "A major breakthrough has now been made . . . which has brought a sophisticated choice of law approach to this question."[15] 1976 Supp. Prac. Commentary to N.Y.C.P.L.R. § 202 (McKinney Supp.1978–79). However, *Martin* was appealed to the New York Court of Appeals which, on January 18, 1978, issued

an opinion that is the most recent authoritative indication of New York's position. *Martin v. Julius Dierck Equipment Co.*, 43 N.Y.2d 583, 403 N.Y.S.2d 185 (1978). Despite Dean McLaughlin's view to the contrary, *see* 1978 Supp. Prac. Commentary to N.Y.C.P.L.R. § 202 (McKinney Supp.1978–79), I do not read the Court of Appeals' *Martin* opinion as changing the place of injury rule. Rather, it seems to have strengthened the *Arneil* Court's approach to the borrowing statute question.

In analyzing a complaint stating claims in negligence and breach of warranty, Judge Jasen, writing for the majority,[16] framed the issue as "whether, for purposes of CPLR 202, plaintiff's causes of action for personal injury accrued in the jurisdiction in which he was injured or in the jurisdiction in which the vehicle alleged to have caused the injury was delivered." 43 N.Y.2d at 586–587, 403 N.Y.S.2d at 186. After reciting the facts and procedural history of the case, the Court stated: "Critical to the application of the borrowing statute is the determination of the jurisdiction in which a cause of action 'accrues.' Before this determination can be made, however, it is necessary to characterize correctly the plaintiff's cause of action." *Id.*, 43 N.Y.2d at 589, 403 N.Y.S.2d at 187. The Court then went on to hold that when privity between plaintiff and the seller of a "defective" product was lacking, plaintiff's causes of action for personal injury were in negligence and strict liability in tort, rather than breach of warranty. Turning then to the borrowing statute issue the Court said: "When [CPLR 202] speaks of 'accrual' of a cause of action, it must logically refer to a cause of action upon which a lawsuit may be brought, even if damages could not be

---

**15.** *But see Bache Halsey Stuart Inc. v. Namm*, 446 F.Supp. 692, 696 (S.D.N.Y.1978) (per Griesa, D. J.), applying the place of injury rule stating: "Although the *Arneil* decision did not refer to the [Appellate Division's] *Martin* case, and indeed an examination of the briefs filed with the Court of Appeals shows none of the parties discussed the *Martin* case, *Martin* was handed down on June 14, 1976, over eight months before *Arneil*, and this Court should

not lightly presume that the Court of Appeals failed to consider it in their deliberations."

**16.** *Martin* in the New York Court of Appeals was a 4–3 decision. 43 N.Y.2d 583, 403 N.Y. S.2d at 193. However, the three dissenting judges were "in accord with much of the majority's discussion" of the borrowing statute. *Id.*, 43 N.Y.2d at 593, 403 N.Y.S.2d at 190 (Gabrielli, J., dissenting in part).

fully assessed until later. . . . [Plaintiff's] cause of action accrued only when he was injured in Virginia." *Id.*, 43 N.Y.2d at 591, 403 N.Y.S.2d at 189. Finally, "Plaintiff possessed no cause of action, in tort or in contract, anywhere in the world until he was injured in Virginia. . . . Consequently, for purposes of the borrowing statute, CPLR 202, plaintiff's causes of action in negligence and strict products liability accrued in Virginia, *the place of the injury." Id.* (emphasis added). Nowhere in either the majority or dissenting opinion did the Court of Appeals purport to apply a modern choice of laws approach. The Court undertook no analysis of "significant contacts" or varying state "interests" in the litigation. Most tellingly, unlike the Appellate Division, not once did the Court of Appeals cite any of the long line of New York precedents which established and refined that State's conflicts of laws approach.[17] In my view, the *Martin* case stands for the proposition that, for borrowing statute purposes, causes of action sounding in tort "accrue" at the place of injury, or in the *Arneil* Court's formulation with respect to fraud claims, "where the economic impact is felt."

But even assuming for the sake of argument that New York might in some circumstances use interest analysis to determine where a cause of action accrued, I would conclude that plaintiffs' fraud claims arose outside New York. As the *Arneil* Court said: "Plaintiffs misread *Babcock* [v. *Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)] if they interpret it as requiring us merely to list the contacts, tot

them up, and choose the limitations statute of the State whose list is the longer." 550 F.2d at 779. Rather, the modern approach is to give " 'controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation.' " *Id.* quoting *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454 (1972).

■ New York's interest in the "specific issue" before me, expressed by its legislature through enactment of the borrowing statute, is twofold: the prevention of "forum shopping" by nonresident plaintiffs seeking the most favorable statute of limitations; and the protection of resident defendants by giving them the benefit of the shortest limitations period.[18] *Martin v. Julius Dierck Equip. Co., supra,* 52 A.D.2d 463, 384 N.Y.S.2d at 479. The other jurisdictions with a connection to this litigation have no real interest in New York affording these Arkansas plaintiffs suing New York defendants the benefit of the longer New York fraud statute. Neither Tennessee, where plaintiffs' account was handled, nor Arkansas, where plaintiffs reside, can have a legitimate interest in New York providing plaintiffs with a longer limitations period than those states would afford their own residents suing in their home state courts.

■ In summary, I conclude that for borrowing statute purposes plaintiffs' fraud claims accrued outside New York and they are barred if untimely under either New York law or the law of the state where they

---

17. The Court of Appeals was well aware that the Appellate Division had expressly premised its *Martin* holding on the modern choice of laws doctrine. *See* 43 N.Y.2d 583, 403 N.Y.S.2d at 187 (Court of Appeals); 52 A.D.2d 463, 384 N.Y.S.2d at 438 (Appellate Division). It seems all the more significant that the Court of Appeals, after noting this, failed either to indicate its approval of the lower court's analysis, or indeed to follow that approach itself.

18. Judge Ward's refusal to apply the traditional rule in *Natural Resources Corp., supra,* can be read as giving effect to the policies underlying New York's borrowing statute, and as not altogether at odds with *Arneil v. Ramsey.* In *Natu-*

*ral Resources,* there was no question but that a foreign statute of limitations controlled; the issue was whether a corporate change of "residence" subsequent to the commission of the tort called for application of the statute of the corporation's new home state. The Court said: "Presumably the economic impact of either victory or defeat in this lawsuit will be felt in Colorado. . . . If *lex loci delictus* is the normal rule on borrowing statute questions, the instant case is the exception to that rule. Here, in contrast to *Arneil v. Ramsey,* there is no resident party to be protected. Here, as in that case, forum shopping can be discouraged, but by a different route." 427 F.Supp. at 885.

accrued. I further conclude that, under the *Arneil* case, *supra*, the situs of plaintiffs' economic loss, that is, the place where the injury to them is felt, is Arkansas, the state of their residence.[19] Accordingly, it is the shorter of the New York and Arkansas limitations periods that determines the timeliness of plaintiffs' fraud claims.

The applicable New York limitations period for fraud claims—whether under the federal securities laws or under the common law—is six years from the date of the fraud, N.Y.C.P.L.R. § 213(8), or two years from discovery, N.Y.C.P.L.R. § 203(f), whichever is longer. *See Phillips v. Levie*, 593 F.2d 459 at 469–70 n. 12 (2d Cir. 1979). Assuming for the sake of this discussion that the earliest possible date from which the six year New York statute began to run was June 15, 1971—when defendant Edie sold the entire portfolio of plaintiffs' securities entrusted to their management—plain-

tiffs' suit filed in November, 1976, was timely. Thus, it becomes crucial to determine whether the institution of suit in November, 1976, was timely under Arkansas law.

The fraud claims at issue here are governed by one of two possible limitations periods—that contained in the Arkansas Blue Sky Law, 6 Ark.Stat.Ann. § 67–1256 (1966 ed. and 1977 Supp.) or the general Arkansas statute applicable to fraud claims, 3B Ark.Stat.Ann. § 37–206 (1962 ed. and 1977 Supp.). *See Lane v. Graves*, 525 F.2d 311 (8th Cir. 1975); *Vanderboom v. Sexton*, 422 F.2d 1233 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970).

■ Plaintiffs' common law fraud claim is, of course, governed by the latter statute which provides a three year period of time in which to sue after accrual of the cause of action.[20] 3B Ark.Stat.Ann. § 37–206. *Van-*

---

**19.** The suggestion in *Sack v. Low, supra,* 478 F.2d at 368, that the place where a securities account is maintained (and thus where a loss in that account is reflected) might be the place of accrual of a securities fraud claim, could call for the application of the Tennessee statute of limitations here. Plaintiffs' account was maintained at Merrill Lynch's Tennessee office. By statute, Tennessee applies a two-year limitations period to securities fraud claims whether arising under the common law, federal securities law, or the Tennessee blue sky law. 8A Tenn.Code Anno. § 48–1652 (1964 ed. & 1976 Supp.). Because the Tennessee limitations period is shorter than that of Arkansas, my application of the latter statute is more favorable to the Posners. Plaintiffs' principal contention on this motion—that the New York borrowing statute is inapplicable—is rejected in any event.

**20.** Plaintiffs' claim for damages for breach of fiduciary duty is likewise governed by a three year statute of limitations whether Arkansas law, 3B Ark.Stat.Anno. § 37–206, or New York law, C.P.L.R. § 214(4), is applied.

In *Lane v. Graves, supra,* the Eighth Circuit construed a complaint seeking damages for fraud, malpractice, prima facie tort, breach of fiduciary duty and conspiracy to accomplish the foregoing. The Court affirmed a decision of the District Court for the Eastern District of Arkansas dismissing the complaint as barred by the three year Arkansas statute on the ground, *inter alia*, that "there is a strong suggestion in the language of more recent [Arkansas] cases that section 37–206 [the three year

statute] will be applied to all torts except those specifically subject to another statute." 525 F.2d at 313. The Arkansas statutes contain no limitations period expressly applicable to breach of fiduciary duty claims. Thus, the three year statute, § 37–206, applies.

Under New York law, an action for *damages* based on breach of fiduciary duty (as opposed to an action seeking equitable relief) is governed by the three year statute applicable to actions to recover damages for injury to property. N.Y.C.P.L.R. § 214(4) (McKinney Supp. 1978–79). *Dinerman v. Sutton*, 45 Misc.2d 791, 258 N.Y.S.2d 13, 15 (1965) (citing *Geltman v. Levy*, 17 Misc.2d 525, 187 N.Y.S.2d 355 (1959); *Tobias v. Celler*, 265 App.Div. 1065, 37 N.Y. S.2d 399 (S.Ct.1942), *aff'd*, 265 A.D. 1065, 39 N.Y.S.2d 1020 (2d Dept. 1943)). Plaintiffs' action here seeks monetary damages for defendants' alleged breach of duty.

Since there is no conflict between New York and Arkansas law on this issue, it is perhaps unnecessary to resolve the question of where this cause of action accrued for borrowing statute purposes. Nonetheless, in the interests of clarity and completeness, I hold that the claim for breach of fiduciary duty accrued in Arkansas. This cause of action, as pleaded by plaintiffs, is inextricably intertwined with the fraud claims; plaintiffs rely upon the identical allegations to support their claims of fraud and breach of duty.

Further, insofar as breach of fiduciary duty is a claim in tort, it is subject to the "place of injury rule," discussed in text *ante*. To the extent that plaintiffs suffered financial injury, they suffered it in Arkansas. *Arneil v. Ramsey, supra*.

*derboom v. Sexton, supra,* 422 F.2d at 1237 n. 4 (citing *Air Leases Inc. v. Baker,* 167 F.Supp. 145 (W.D.Ark.1958)); *Beam v. Monsanto Co., Inc.,* 259 Ark. 253, 532 S.W.2d 175, 180 (1976); *White v. McBride,* 245 Ark. 594, 434 S.W.2d 79 (1968). I conclude for the reasons that follow that plaintiffs' federal fraud claims are governed by that same three year period.

 In determining which of the two arguably relevant Arkansas statutes of limitations control, I am guided by the principle recently stated by the Second Circuit:

> "[F]ederal courts apply those [state] statutes of limitation . . . which best effectuate the policies underlying the federal statute. In actions alleging fraudulent violations of the federal securities law, this court has consistently adopted state statutes of limitations for actions based upon common law fraud." *Stull v. Bayard,* 561 F.2d 429, 431 (2d Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978) (citation omitted).[21]

*See Phillips v. Levie,* 593 F.2d 459 at 461 (2d Cir. 1979) (apply the limitations period of the "most closely analogous state law action"). Analysis of private damage actions under the Arkansas Securities Act, 6 Ark. Stat.Ann. § 67–1235 *et seq.* (1966 ed. and 1977 Supp.), does not persuade me that the usual rule in this Circuit—adopting the statute of limitations for common law fraud—should be abandoned here in favor of the Arkansas blue sky statute of limitations.

The precise Arkansas counterpart of Rule 10b–5 is codified at 6 Ark.Stat.Ann. § 67–1235 (1966 ed.).[22] Section 67–1235 contains no limitations period, and, prior to 1977, the Arkansas Securities Act expressly provided that no private cause of action was created thereunder. *Id.* § 67–1256(h) (1966 ed.). This impediment to private suit under § 67–1235 was removed, effective in 1977, see *id.* § 67–1256(h) and Compiler's Notes thereto (1977 Supp.). The Court's research has disclosed no reported decisions in private litigation under § 67–1235 and consequently, no holdings as to the applicable statute of limitations for claims under that section. Private civil actions under the Arkansas Securities Act are expressly provided for in § 67–1256 (1966 ed. & 1977 Supp.). This section parallels § 12 of the 1933 Act, 15 U.S.C. § 77*l*, and codifies what is essentially a private contractual remedy for rescission or damages[23] against one who has bought[24] or sold a security by means of a material misrepresentation or omission. The Arkansas statute further provides: "No person may sue under [§ 67–1256] after five (5) years from the effective date of the contract of sale."[25] § 67–1256(e) (1977 Supp.).

---

21. The *Stull* panel was aware that Courts of Appeals in other Circuits had applied the state blue sky periods of limitations in Rule 10b–5 cases. *See* 561 F.2d at 432 n. 3.

22. The statute reads:

"Unlawful acts in connection with offer, sale or purchase of securities.—It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 6 Ark.Stat.Ann. § 67–1235 (1966 ed.).

23. Similar to § 12 of the 1933 Act, § 67–1256 provides for the return of consideration as the measure of damages.

24. The Arkansas statute is broader than § 12 of the 1933 Act in this respect.

25. At the time the alleged fraud here is meant to have occurred, § 67–1256(e) provided a limitations period of three years from the sale, or one year from discovery of the fraud, with a limit on the discovery rule of five years from the sale. 6 Ark.Stat.Ann. § 67–1256(e) (1966 ed.) amended in 1973. *See* Compiler's Notes to § 67–1256 (1977 Supp.). The five year provision quoted in text was in effect at the time this litigation was commenced, and the statute does not appear to proscribe application of the new period to claims accruing, but not sued on, prior to 1973.

In the leading decision on point, the Court of Appeals for the Eighth Circuit held that § 67–1256 provided the appropriate limitations period under Arkansas law for Rule 10b–5 claims. *Vanderboom v. Sexton, supra,* 422 F.2d at 1236–40. The *Vanderboom* Court's holding was expressly premised on a rationale that is no longer viable. In 1970, when *Vanderboom* was decided, the Eighth Circuit did not require scienter in Rule 10b–5 actions; the Rule was construed to prohibit misrepresentations even negligently made. *Id.* at 1238, citing *Myzel v. Fields,* 386 F.2d 718, 734–35 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Negligent misrepresentations also were actionable without scienter under § 67–1256 of the Arkansas blue-sky law. However, common law fraud under Arkansas law required proof of scienter or intentional misrepresentation. Because of this crucial difference in the scienter requirement, the § 67–1256 cause of action, rather than common law fraud, was viewed as the state law analogue of Rule 10b–5.[26] Thus, the Court held that the statute of limitations contained in § 67–1256 was the appropriate period for Rule 10b–5 claims.

Importantly, however, the Eighth Circuit opined that, were Rule 10b–5 construed to require scienter and thus to be basically analogous to common law fraud, "it [would be] perhaps correct to use the local statute of limitations which specifically applied to common law fraud, rather than the statute of limitations pertaining to the local blue sky law. . . . " *Id.* *Accord, Corey v. Bache & Co., Inc.,* 355 F.Supp. 1123, 1126 n. 1 (S.D.W.Va.1973) (citing *Charney v. Thomas,* 372 F.2d 97 (6th Cir. 1967); *Rice v. U. S.,* 149 F.2d 601 (10th Cir. 1945); *Trussell v. United Underwriters Ltd.,* 228 F.Supp. 757 (D.Colo.1964)). The Supreme Court's decision in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), holding scienter to be a necessary element of a private Rule 10b–5 cause of action, undermines the *ratio decidendi* of *Vanderboom.* With the requirement of scienter, the Arkansas action most closely analogous to actions brought under Rule 10b–5 is that for common law fraud.[27] Accordingly, I hold that under the New York borrowing statute, discussed *ante,* plaintiffs' federal and common law fraud claims are subject to the three year Arkansas statute of limitations, § 37–206.

While state law thus provides the applicable statute of limitations for Rule 10b–5 claims, federal law determines when the cause of action accrued, i. e., when the limitations period begins to run. *Phillips v. Levie, supra,* 593 F.2d at 461; *Arneil v. Ramsey, supra,* 550 F.2d at 780. The Second Circuit's latest formulation holds: "Under federal law the statute begins to run 'when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge.'" *Phillips v. Levie, supra,* 593 F.2d at

---

**26.** Plaintiffs' counsel's assertion that "The Arkansas Securities Act § 67–1256(e) specifically provides that where the Federal Securities Exchange Act provides for no statute of limitations, Arkansas will apply a 5 year statute of limitations," Memorandum of Law in Opposition to Motion to Dismiss or for Summary Judgment at 5, is simply untrue.

**27.** The Second Circuit's expansion of the definition of scienter, i. e. "intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder, supra,* to include recklessness, *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44–48 (2d Cir. 1978), does not change this result. Construing *Rolf,* the Court recently stated: "[A] reckless disregard for the truth or falsity of a material statement, *as distinguished from mere negligence,* may constitute scienter or the legal

equivalent of knowledge." *SEC v. Coven,* 581 F.2d 1020, 1025 (2d Cir. 1978) (emphasis added).

The *Coven* Court's holding that negligence, not scienter, was the applicable standard for § 17(a) violations was limited to SEC enforcement actions under that statute. 581 F.2d at 1027. The Court expressly left open the question whether scienter was necessary in a private § 17 action, *id.* at 1027 & n. 15, but noted that other courts had so held. *See, e. g., Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790 (7th Cir. 1977); *Malik v. Universal Resources Corp.,* 425 F.Supp. 350 (S.D.Cal.1976). *See also,* 3 Loss, Securities Regulation 1784–87 (2d ed. 1961); 6 Loss, Securities Regulation 3912–15 (1969 Supp.).

461–62, *quoting Stull v. Bayard, supra,* 561 F.2d at 422. The Court has cautioned, however, that the operative date "is not the time at which a plaintiff becomes aware of all the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme. The statutory period . . . [does] not await [plaintiff's] leisurely discovery of the full details of the alleged scheme." *Arneil v. Ramsey, supra,* 550 F.2d at 780 (citations omitted). Briefly stated, the crucial question is "when [did] plaintiffs learn[ ] facts sufficient in law to put them on notice of the existence of the alleged fraud." *Id.* at 780–81. Applying these principles, I hold that the limitations period began to run on plaintiffs' fraud claims not later than September 29, 1972, the date on which plaintiffs cancelled their account management agreement with the defendants.[28]

The fraud alleged by plaintiffs in their complaint and reiterated in counsel's affidavit and memorandum in opposition to the instant motion has two aspects. The first charges a series of misrepresentations on the part of both defendants designed to fraudulently induce plaintiffs to enter into the account management agreement.[29] The

second aspect of the alleged fraud concerns defendant Edie's actual handling of the account over the life of the agreement.[30]

The record before me on this motion contains affidavits of Edie and Merrill Lynch employees, and documentary evidence, which compel the conclusion that plaintiffs were kept fully informed of the conduct of their account, and the fees and commissions generated thereby, throughout the effective period of the management agreement. Plaintiffs do not dispute this. In fact, plaintiffs' counsel affirms that "On October 4, 1972, *upon learning of the said fraud* plaintiffs cancelled the contract, and instituted the within action on November 12, 1976—the subject of this motion."[31] Affidavit of Joseph M. Pogostin, January 11, 1978, ¶ 10 (emphasis added). Additionally, counsel asserts that plaintiffs received notice of each transaction in their account within 3 to 5 days of its completion. Plaintiffs' Memorandum in Opposition at p. 4.

Not one of the specifications of fraud detailed in the complaint is alleged to have been concealed from plaintiffs. Rather, it seems that the full disclosure of the conduct of the account which occurred periodically from June, 1971 to October, 1972 is what

---

**28.** It is unnecessary for the purposes of this motion to decide whether plaintiffs had sufficient notice of the alleged fraud to trigger running of the statute prior to September 29, 1972.

**29.** Specifically, defendants are alleged to have made misrepresentations as to the following: expert and efficient portfolio management; investment for long-range growth and income; no speculative trading; reasonably safe and sound administration with an eye to the quality of plaintiffs' previous investments; no "churning" of the account to generate commissions; fees of approximately $250 per year; expert administration to produce income in excess of average market growth; limitation of losses in the account; reasonable and conservative expert management; and administration of the account solely for plaintiffs' best interest. Complaint, ¶ 17. Further, defendants are meant to have fraudulently failed to disclose: that Merrill Lynch would continue to receive brokerage commissions; that the number of account transactions would increase, thereby increasing commissions; and that Edie would purchase less stable and lower quality stock than had plaintiffs. Complaint, ¶ 18.

**30.** Thus, plaintiffs charge that "on or about the 15th day of June, 1971, the defendants sold every security turned over to them by the plaintiffs, and commenced a program of buying and selling securities for plaintiffs' account without consultation with or the approval of the plaintiff . . . complet[ing] 28 individual transactions on plaintiffs' account, all without consultation, discussion, or the approval of the plaintiffs." Complaint, ¶¶ 11, 12. Further, it is alleged that defendants returned to plaintiffs a portfolio "of seven (7) highly volatile and risky securities," having managed the account "without concern or regard for sound investment analysis, and . . . the best interest of the plaintiffs" and having engaged in "churning." Complaint, ¶¶ 14, 15.

**31.** Counsel's use of the October date is apparently an oversight. The cancellation letter bears a September 29, 1972 date; October 4, 1972 is the date on which Edie received the letter.

prompted plaintiffs' dissatisfaction with the defendants' performance, the cancellation of the agreement, and ultimately the institution of suit. There is not a single fact which plaintiffs are alleged to have learned after September 29, 1972 which served to put them on notice of the supposed fraud.[32] If fraud there was, plaintiffs surely were possessed of all relevant facts when they penned their letter of cancellation. Thus, I hold and I take it to be undisputed, that the applicable limitations period began to run not later than September 29, 1972.

Given that operative date, the question is whether suit, instituted on November 12, 1976 was timely under Arkansas law. Resolution depends upon application of the three year Arkansas fraud statute, § 37–206 discussed *ante,* plus any tolling periods available under Arkansas law. *E. g., Braniff Airways, Inc. v. Curtiss-Wright Corp.,* 424 F.2d 427 (2d Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 59, 27 L.Ed.2d 59 (1970) (under CPLR § 302, borrow foreign statute *in toto,* including tolls). While the issue has not been briefed, the Court's own research discloses two possible bases for extending plaintiffs' time beyond September 29, 1975, the last date on which suit could have been brought under the three year statute.

The first, codified at 3B Ark.Stat.Ann. § 37–222 (1962 ed.), provides a one year grace period in which to refile an action which has been "non-suited." *See Coleman v. Young,* 256 Ark. 759, 510 S.W.2d 877 (1974) holding timely under § 37–222 an otherwise stale action which had been reinstituted within one year of federal court's dismissal for lack of diversity. As-

suming § 37–222 to be applicable to a dismissal for lack of personal jurisdiction, *but cf. Smalley v. Hutcheon,* 296 N.Y. 68, 70 N.E.2d 161 (1946) (no toll under CPLR § 205 for such a dismissal); *Erickson v. Macy,* 236 N.Y. 412, 140 N.E. 938 (1923) (same); plaintiffs would have had until February 12, 1976 in which to bring suit after the Tennessee federal district court's dismissal of their prior suit in February 1975. Since suit here was not commenced until November, 1976, § 37–222 is unavailing.

A second possible toll might have occurred on the theory that because defendants were never amenable to suit in Arkansas, the statute of limitations never began to run. *Cf.* N.Y.C.P.L.R. § 207. It is unnecessary to decide whether the Arkansas long-arm statute, 3A Ark.Stat.Ann. § 27–2502 (1977 Supp.), would have provided a basis for the exercise of personal jurisdiction, thus obviating this toll, *cf.* N.Y.C.P. L.R. § 207(3), since Arkansas law has no tolling provision comparable to New York's § 207.[33]

For the foregoing reasons, I hold that plaintiffs' claims for federal and common law fraud, and breach of fiduciary duty, see note 20 *supra,* were time-barred by the three year Arkansas statute of limitations, § 37–206, when suit was instituted here on November 12, 1976. Accordingly, on motion of defendants, Count I of the complaint, alleging the federal securities fraud claims, is dismissed in its entirety; the claims for common law fraud and breach of fiduciary duty contained in Count II of the complaint are dismissed; Count IV, which seeks punitive damages for fraud and

---

**32.** Thus, there is no contention that the investigation meant to have been undertaken on plaintiffs' behalf, see text at note 8, *supra,* revealed any new facts which first brought the fraud to light. Even assuming that the best evidence as to when plaintiffs had knowledge of the fraud is that letter from Arkansas counsel, the instant litigation was commenced more than three years after August 8, 1973.

**33.** Indeed, Arkansas law expressly provides that statutes of limitations "shall apply to non-residents, as well as residents of this state." 3B Ark.Stat.Ann. § 37–230 (1962 ed.). The Arkansas Supreme Court has held that enact-

ment of § 37–230 expressly overruled a prior statute providing that whenever a claim accrued against a person out of the state, that statute did not begin to run until his return. *Rock Island Plow Co. v. Masterson,* 96 Ark. 446, 132 S.W. 216, 217–18 (1910). In the Arkansas Court's formulation "[W]e think that it was the intention of the Legislature to provide for the running of the statute from the time when the cause of action accrued, whether the same accrued in this state or another state, and whether it accrued against a resident or non-resident . . . ." *Id.* at 218.

breach of fiduciary duty, is likewise dismissed *in toto.*

## V.

With respect to the remaining claims: Count II, insofar as it states a claim for breach of contract, is discussed *post.* Count III seeks the recovery of damages equal to the lost investment potential of plaintiffs' capital, based on "the defendants' failures and abuses, and fraudulent mismanagement of plaintiffs' assets." Complaint ¶ 29. As pleaded, the claim for damages contained in Count III is based on theories of fraud and/or breach of fiduciary duty. Plaintiffs' submissions on this motion provide no further clarification of the basis for this claim, nor dispute defendants' assertion that fraud, and not breach of contract, is the underlying claim upon which recovery of such damages is premised. Count III must fall with the fraud claims. Accordingly, it is dismissed.

## VI.

Plaintiffs' remaining claim is one for common law breach of contract. Were principles of pendent jurisdiction the sole basis for entertaining that claim, I would, with the pre-trial dismissal of the federal claims, decline to exercise whatever discretionary power inheres in this Court to retain jurisdiction over the state law cause of action. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1965); *Abrams v. Carrier Corp.,* 434 F.2d 1234, 1254 (2d Cir. 1970); *HS Equities, Inc. v. Fleet,* 420 F.Supp. 947, 949 (S.D.N.Y. 1976). However, jurisdiction is also posited upon diversity of citizenship, 28 U.S.C. § 1332, and the *Strawbridge* rule of complete diversity is satisfied here. *Strawbridge v. Curtiss,* 3 Cranch. (7 U.S.) 267, 2 L.Ed. 435 (1806).

Defendants do, however, move for dismissal of the contract claim on two grounds. First, with respect to defendant Merrill Lynch, it is asserted that the complaint fails to state a claim upon which relief can be granted since Merrill Lynch was not a party to the contract in suit.

Plaintiffs do not dispute this. The contract on its face is between Edie and the Posners. In relevant part it provides: "VI. The Corporation [i. e. Edie] is a subsidiary of Merrill Lynch, Pierce, Fenner & Smith Incorporated; nevertheless, the Corporation [Edie] is exclusively responsible for the performance of its duties and any liabilities to the Client arising under this agreement or otherwise." Complaint, Exhibit II. Pursuant to the stipulation between the parties, the following facts were "deemed admitted for the purpose of this action and need not be otherwise proved."

"On June 15, 1971, the plaintiffs entered into an account management with Lionel D. Edie & Company, Inc. ("Edie"), whereby Edie would manage their Merrill Lynch account no. 564–37607 . . . .. "On October 4, 1972, plaintiffs cancelled their management agreement with Edie. . . ." Affidavit of Joanne Welty, December 7, 1977, Exhibit B. The allegations of the complaint respecting the breach of contract claim refer to Edie's management of the account. Complaint ¶¶ 22–25. There is no allegation that Merrill Lynch incurred management obligations under the contract, or actually undertook such management. Plaintiffs do not contest the assertion of defense counsel, based on personal knowledge, that the contract "was between plaintiffs and Edie. Merrill Lynch was not a party to such agreement and accordingly had no contractual obligations thereunder." Affidavit of Joanne Welty, January 18, 1978, at ¶ 4. The bare assertion in plaintiffs' complaint, unsupported by any further showing on this motion, that Edie "is, upon information and belief, an alter ego of, or subsidiary or affiliate of the said Merrill Lynch; working together, referring jobs to each other, and utilizing services one of the other," Complaint ¶ 6, is insufficient to raise a genuine issue respecting piercing Edie's "corporate veil" to render its parent, Merrill Lynch, liable. *Cammarata v. Ice Cream Drivers,* 441 F.Supp. 696, 697–98 & n. 1 (E.D.N.Y.1977). *See generally Walkovsky v. Carlton,* 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966); *Bartle v. Home*

*Owners Coop., Inc.,* 309 N.Y. 103, 127 N.E.2d 832 (1955); *Berkey v. Third Ave. Ry.,* 244 N.Y. 84, 155 N.E. 58 (1926). Accordingly, the breach of contract claim in Count II is dismissed as to defendant Merrill Lynch.

### VII.

 The final issue on this motion concerns the breach of contract claim against Edie. Defendants move for dismissal on the ground that there is no subject matter jurisdiction over this claim since the amount in controversy does not exceed $10,000.00 exclusive of interest and costs. 28 U.S.C. § 1332(a).

The legal standards for testing this contention are clear. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Dismissal on the ground of insufficient amount in controversy however, should be granted only when it appears "to a legal certainty" that the jurisdictional amount requirement cannot be met. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 642 n. 10, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Moore v. Betit,* 511 F.2d 1004, 1006 (2d Cir. 1975). "Normally the jurisdictional amount requirement is met by a good faith allegation of the plaintiff. [But w]hen defendant challenges that amount, plaintiff has the burden of demonstrating the amount." *Moore v. Betit, supra,* 511 F.2d at 1007.

The items of damage which plaintiffs seek under their breach of contract claim, Count II of the complaint, are as follows: (1) the difference in the actual value of the portfolio as turned over to Edie in June, 1971, and as returned to the Posners in October, 1972; (2) losses in dividend income over the life of the contract; (3) brokerage commissions paid to Merrill Lynch during the relevant period; and (4) management fees paid to Edie.

I assume without deciding that each of these items would be recoverable in full on a breach of contract theory. The issue here is whether, given that assumption, a recovery in excess of $10,000 is or is not possible. I hold that it is not.

There is no material dispute as to the valuation of items (1), (3) and (4). Pursuant to the parties' stipulation,[34] the value of the portfolio on June 15, 1971 was $38,612.50; on October 4, 1972, its value was $32,371.50. The difference in value, item (1), is $6,241.00. The parties also agree that brokerage commissions to Merrill Lynch, item (3), and management fees to Edie, item (4), totalled $1,595.00 and $497.55,[35] respectively. The sum of items (1), (3) and (4) is therefore $8,333.55.

The crucial item thus becomes lost dividends, item (2). The complaint alleges a loss in dividends of some $3,352.00. Complaint ¶ 20. However, plaintiffs' counsel's affidavit and memorandum asserts the lost dividends to be $2,235.28, a figure arrived at in the following manner: the June 15, 1971 portfolio paid annual dividends of $2,049.00; the October 4, 1972 portfolio paid annual dividends of $931.36; the annual difference being $1,117.64. Counsel then doubled this amount to reach a figure for lost dividends *over two years.* There is no explanation of why a two-year period was used when it is undisputed that the agreement was in effect for only 16 months.[36] Plaintiffs have not met their burden of

---

34. See note 5, *supra.*

35. The recovery of fees paid to Edie was not specifically sought in the complaint, perhaps because the contract expressly contemplated minimum management fees of $250 per year. See note 29, *supra.* However, on this motion the parties have treated the item as if it were alleged originally. The Pogostin affidavit seems to claim $800 in fees paid to Edie; plaintiffs' memorandum states the amount to be $500. I accept the figure contained in the Dooley affidavit of January 18, 1978, i. e. $497.55, which is supported by uncontested documentary evidence.

36. For example, the decrease in portfolio value and the fees and commissions paid were all based on the 16-month period that the account management agreement was in effect.

demonstrating that lost dividends should be calculated for a two-year period. Even accepting plaintiffs' unsupported assertion of a $1,117.64 per year reduction in dividends,[37] the loss pro rated over a 16-month period is $1,490.18. When this amount is added to the sum of items (1), (3) and (4), i. e. $8,333.55, the total amount in controversy is revealed to be $9,823.73, an amount insufficient in law to support jurisdiction over the breach of contract claim under 28 U.S.C. § 1332(a).[38] Accordingly, Count II of the complaint must be dismissed.

### CONCLUSION

The complaint is dismissed in its entirety against both defendants. The Clerk of the Court is directed to enter judgment accordingly.

It is so ordered.

---

**37.** This is the most favorable construction of the facts respecting lost dividends. The Welty affidavit of January 18, 1978 contains copies of the monthly statements summarizing activities in plaintiffs' account which provide the basis for alternative calculations of lost dividends. For example, it appears that during the 16 months of Edie's management, the dividend income was actually $1,956.76. Dividend income for the 16 months immediately prior thereto was $2,828.57—a reduction in dividends of only $871.81. Alternatively, the portfolio earned $2,112.45 from June, 1970 to June, 1971, the year prior to the contract, and $1,473.50 from June, 1971 to June, 1972, the first contract year. This equals an annual dividend loss of $638.95, or $851.93 pro rated over 16 months.

**38.** This reasoning would, of course, be equally applicable to Merrill Lynch, were it a proper party defendant on the contract claim.